Talking about the heat, I assume you want some of us at least to survive the argument. So if we could turn down the temperature, it'll probably get turned up by council anyhow, but if we can at least adjust the thermostat and try to turn it down, that would be helpful. We're here in the matter of, it's a death penalty case, obviously, Wilson versus Beard. Mr. Glead, ready to proceed? Good morning, Judge McKee. Morning. Good morning, Judge Roth. Good morning, Judge Shigaris. Good morning. I'm David Glead of the Philadelphia District Attorney's Office, representing the Commonwealth of Pennsylvania, the appellant in this appeal. With the court's permission, I would like to reserve two minutes for rebuttal. Okay. Thank you very much, Your Honor. I had hoped to take a minute at the beginning of my argument, without the court's interruption, mainly to discuss my- You really don't want to revisit. That was a ridiculous request. It's a death case. There's some serious issues here you got. But, Your Honor, let's just get into the legal argument. The final four, I think, is more important, and that is exactly what I was going to discuss with my picks for the final four. But if the court would rather I save that for rebuttal, I will save that for rebuttal. Actually, I don't need a minute to summarize my case. I think I can summarize my case on both the procedural and the Brady. Well, let me ask this. It's not clear to me whether or not Ms. Fisk knew that the detective's testimony that he had not given anything to Gaynor at the trial. I don't know if she, I assume that that came out later on when the 39th district was being investigated. And that it's not clear on the record, to me anyhow, whether or not at the time that testimony came out, she knew about it. Is there anything to suggest that she knew about it at the time the detective made the statement during the trial? Well, Your Honor, if you're going to characterize, I mean, that's actually, that, there's a, there's a problem in how you characterize what, what gave mean. And I think that, that. I'm sorry, what? What the word gave mean. I mean, he, I. He testified. He made a statement. He, he, he answered a question. Yeah, right. Gaynor. And I use the word gave in this context, referring to testimony. Assume, unless the context indicates otherwise, that refers to what the officer said, i.e. gave as an answer in response to the question. Okay, can we move on now? I see, I see. Well, I, Your Honor, I, I don't think it was clear until the PCRA hearings exactly what was known. I think what was known and what was even explored at trial was that the officer and Gaynor were friends. And they had been friends for a long time. And so the extra additional fact that Mr. Wiseman says is so critical, the fact that a friend loaned money to another friend, we, we just don't think is, it's, it's something that might have a very minor impeachment value. But it, it wasn't clear. I, I, I don't think it was clear whether that's something that Ms. Visk actually knew. I think the court, the court, and I, I suppose if you read Brady broad enough, that because it's something the police knew, meaning the officer Fleming, that, that she's charged constructively or, or that's imputed to her. You don't have to read it very broadly. The cases specifically say that if the information is in with the knowledge of the police department, that's information which is constructively charged under Brady to the, you can argue about it, it's materiality. Right, right, right. And I, I don't think we'll, we'll, we'll challenge that, of course. Wasn't there testimony at the original trial on cross-examination where Officer Fleming was, they tried to cross-examine Officer Fleming on whether he had paid anything to Gaynor, and the judge refused to admit that. So obviously Officer Fleming knew at the time what had happened, and the fact that this issue was raised, and, and the prosecution gave no further information about it, I think brings Brady to bear right there at the trial. Well, Your Honor, it, it depends, because when you look at Gaynor's. Depends on what? Well, it depends about, again, again, about the characterization of the facts. When you look at Gaynor's, not, I'm sorry, not Gaynor, at the officer's testimony at the PCRA hearing, he said, no, I never, he never gave me anything. I never gave him anything. He was my friend. He didn't characterize occasional loans as giving anything, plus. Well, interest-free loans, that's a little different. Well, interest-free loans, okay, fine, fine. But he specifically. But you know, there's an instruction, and I think this goes to the, if you can, in fact, if there's any way to answer Judge Roth, there's an instruction that the judge is going to give, the all part and none instruction, that's going to tell the jury that if you believe that a witness lied about, deliberately falsified about a material part of the testimony, you can, don't have to choose to disbelieve all part or none of the testimony. Had the jury gotten this instruction, and had they known that the witness, both witnesses, the officer, forget the officer for a second, the identifying witness, Romner, that he lied about receiving money from a police officer, the jury is being told that they can disregard his identification. The case turns on three IDs, and that could cause the jury, wouldn't have to, but it could cause the jury to disbelieve one of those three IDs. Two IDs, not three, two IDs. If it was characterized that way, and I don't think that's a proper characterization of it, because the question is not, was there ever money loaned between these two friends? That was the fact. The important fact for the jury would have been, was this person paid for their testimony? And I think that's clear, and when you look at the officers. Isn't that something the jury could, isn't that something, they'd have to figure that out for themselves, whether or not, not paid as a dollar value thing for his testimony, but whether or not the relationship between the two was such that they just could not rely upon Gaynor's testimony because of his relationship with the police officer. Well, your honor, I think that was brought out of trial. And it's not just being paid for that testimony. If someone is being paid periodically, or is getting favors periodically, as an informant, there is an implication that the informant may want to maintain that relationship and will testify to please whoever is paying him, rather than to testify as to the truth, the whole truth, and nothing but the truth. You don't want to kill the goose that laid the golden egg. But the thing is, what I'm saying is when you look at the testimony of the officer at the PCRA hearing, it's simply, that's just not what happened. That's just not the case. And if it had come out, I think it wouldn't have made any difference at all. Because it was simply two persons who were friends. That came out. There was no... You know, Judge McKee and I have been trial judges, and Judge Chigar certainly has been involved in a lot of trials. And the cross-examination implications of that testimony are very valuable in a case where you're dealing with eyewitness, so-called eyewitness identification. Well, Gaynor was not an eyewitness. No, no. He was the cellmate, right? He was the cellmate, yes. He was relating what had been told to him. Right, right. It was the other two who were the eyewitnesses. Gaynor came in later. But if both IDs are... Jackson's identification, it seems to me, is by itself questionable. I know there's more. There's not just Jackson. But Jackson makes an identification six and a half years later. You're arguing in a brief that that's because he was threatened, which may or may not be true. I don't know. The jury may or may not have accepted that. But clearly the identification that led to the conviction was six and a half years after the incident, after a split second encounter in which he had to be scurried out of his mind. So that identification is nowhere near as strong as Romer's identification, which has problems. So if you look at those two identifications as something that in and of themselves may or may not give you a reasonable doubt, it seems to me that the statement to Gomer or Gaynor really is very important because you've got an admission which then corroborates both identification witnesses and takes any cloud that may be hanging over those IDs away. You don't have to rely upon the identifications because the defendant told Mr. Gaynor that he's the person. So that testimony becomes very important. And the relationship he has with a police officer, and I mentioned killing the goose that lays the golden egg, it does seem to me you're minimizing it. But I'm not sure how you can in good faith minimize it. I'd like to understand what the court is saying because I'm looking at both the officer's testimony at trial and the officer's testimony during the PCRA hearings. And is the court saying that if the officer had testified at trial the same way he had testified at the PCRA hearings, that would have made a difference? I don't know if it would have. The issue is whether or not there's a reasonable probability. Well, if that's what the court is looking at, and I think that's what Mr. Wiseman is arguing. It's the legal standard, isn't it? I'm sorry? Oh, it's the same legal standard, yes. Well, that's what we have to look at then. Yes. And I think when you look at both together, I think it's clear that what the implication would have been raised that this was a witness that was biased because he was being paid to cooperate with the police. He was a regular informant. And that's simply not the case. That's simply not the way he characterized it or the way the officer characterized it. They were simply friends, which is very common. I mean, to give someone a loan interest-free, that's one thing. To have it paid back all the time. We don't know exactly what these loans were, how often they were. They might have been $10 every now and then. That's one thing. To pay a witness for testimony, for cooperation, and for possibly lying on the stand, that's something completely different. And I think if that had come out at trial, which did come out later at PCRA, I don't think it would have made the slightest difference. I think it would have hurt Wilson's case. I think it would have bolstered Gaynor's testimony. How would it hurt his case if it came out that... I'm sorry? How would it have hurt Wilson's case if it came out... Because it would have bolstered Gaynor's testimony. How? Because it basically showed that he wasn't lying out of some motivation to be paid by the police, because he wasn't being paid by the police. He was simply a friend, and that did come out at trial. Well, I think a little bit, at the PCRA, it came out a little bit more that he was a friend, that he was getting interest-free loans. Well, Your Honor, it would have been nice if that had been developed. I mean, I suppose it would have been giving him $1,000 bills. The thing is, on the basis of what came out at trial, should it have been developed, and on the basis of asking Officer Fleming if he had ever given anything to Gaynor, I think that certainly there is a strong argument that that type of information of interest-free loans is covered in information that would help on credibility on cross-examination. Well, Your Honor, again, I think the jurors would have been able to make the distinction between a gift and a loan. And I think that if you're characterizing an interest-free loan between friends as a gift, then I agree with the court. But I don't think the jurors would have looked at that, and they would have looked at it... A beneficial arrangement that may be jeopardized if you don't go along with the police officer's testimony. Again, I urge the court to look at the PCRA testimony, because I don't really think there was any kind of arrangement there. It was simply two friends. If the court would focus on Officer Fleming's testimony at the PCRA, he clarified all of this, and he basically said, there's nothing to this. Well, you assume that Officer Fleming's testimony has the proverbial ring of truth. There were so many problems around Officer Fleming in some of the other testimony that was developed. Well, that's... I know they've been raising other problems with that, although those issues aren't before the court. Could I... I have a concern about the procedural posture of this case. It's pretty unusual we get one of these things on summary judgment. Right. I noticed that your brief, nor your adversary's, really focused on the summary judgment aspect of this. But if you could bear with me for a second, on page 22, the court concludes, respondents do not... And this is under the favorableness findings. Respondents do not contend that there are any genuine issues of material fact with regard to this evidence regarding the court's favorableness, and concede that this evidence would have impeachment value with respect to Jackson, Romming, and Gaynor. Is that so? Yes. Okay. How about... Although, if I could address the court's concern about this, or if the court's... Please, yeah. We did litigate that issue before Judge Padova, because the petition for habeas relief was the typical petition that we see in a lot of capital cases with literally dozens, if not dozens and dozens and dozens of claims. I was getting ready to spend three months answering it, and Mr. Wiseman instead picked one and said, let's do a summary judgment on this. I think I specifically objected to Judge Padova saying that in habeas matters, unlike in ordinary civil cases, it's just inappropriate. It's inappropriate to simply pick, especially in a capital case, because you take one claim out of, say, 50 claims, and say, okay, we're going to litigate this, and you litigate that. Suppose we go all the way to this court and to the U.S. Supreme Court, and he loses on that claim. Yeah, I understand. It would be a piecemeal thing. Then he comes back and says, okay, well, we have 49 other claims. Let's go with those. I understand that concern. My concern, though, is aren't there an entirely different set of presumptions when you're dealing with summary judgment? I mean, aren't you as a non-movement entitled to any – there should be no weighing of the evidence. You know the standards for summary judgment. Right. And that's exactly what I argued before Judge Padova, is technically habeas is a civil procedure, but summary judgment really didn't make much sense. I mean, basically the fact when you bring a summary judgment in an ordinary civil case, and the other side concedes, well, there aren't any material facts in dispute, that's a victory for you. Right. That's a point for you. I understand that. In habeas, it's not. I understand that. There shouldn't be facts in dispute. But the fact is it's gotten to us on summary judgment. We're reviewing a grant of summary judgment. I'm wondering, because the briefs didn't really deal with it, how summary judgment applies in this case. I mean, are there genuine issues of material fact? Now, if we looked at this in our usual habeas case, we might go one way. Right. We're looking for a prism of summary judgment here. Well, Your Honor, actually Judge Padova asked Mr. Wiseman and myself to come up with a list of things, a list of facts that we were not in disagreement on. Right. And I think we were in agreement on the basic facts. I think a lot of the disagreement here is on the characterization of those facts. And I think just the discussion we were just having on what is considered giving. I gave something versus I loaned something without interest. Basically, it was things like that. So you're saying that summary judgment could be appropriate here either way, I suppose. Well. Because there's really no facts that really are disputed. That's what Judge Padova decided. Well, I'm asking you what your position is. We decided simply as a tactical matter not to pursue that here. I'm asking you what your argument is here before this court. Are there genuine issues of material fact that would normally be the type of thing that should be determined by a court or trier of fact? Well, Your Honor, I think. How do you argue that at this point? Having conceded earlier, I think you're bound. Right. I think you are. Well, we're bound by the issues we think aren't contested, and that's exactly what we said. Now, they've raised, and this is what they did in their answering brief, an entire derivative claim of not only things that supposedly were suppressed by the prosecution, but every conceivable fact that could be derived from those facts. That really wasn't before the court below. That's something that we think we're not conceding any of that. In determining under Brady if there's a possibility that suppressed information would make a difference, isn't it part of the process to consider what might be inferred and consider how it would be argued to the jury? And what skillful counsel. Skillful counsel. Right. Would have done with that information. Right. Although I haven't found any case that goes as far as Mr. Wiseman wants it to go. Basically, at least, if the court adopted that rule, if the court adopts his position, it basically means the prosecutor has to have an open files policy. Because everything in the prosecutor's file, every conceivable fact, might be used by the defense to lead to something else. You don't have to get that here. Because with Jackson, he's arguing that had he known about the criminal policy convictions, he would have looked at the pre-sentence report, and that would have led him to these psychological assessments. Now, whether or not you buy the derivative aspect of that, it seems to me the nature of it, this is not just a theft by deception conviction. Right. It's the kind of conviction that even absent the psychological testimony, it seems to me any attorney with his or her assault would say, look at this guy. He's going around impersonating police officers. That tells you something about his character. It's not just the fact of what he was convicted for that suggests he's not worthy of belief. This guy is going to do what he needs to do to project an error of authority. I mean, it's a weird case in that the criminal policy convictions here lend to the very same argument that you could have gotten to the derivative evidence. I'm not sure, even if you're right on the derivative evidence, that they wouldn't have gotten to the psychological assessment of the guy. I'm not sure it undermines the strength of what they're arguing that they could have said to the jury because of the nature of his convictions. The guy disarms and arms such a police officer, posing as a police officer? Your Honor, the problem with their position, and I agree with that. I think that's correct to a point. I think the problem is all of that was easily discoverable or uncoverable by counsel before trial. That's not the law, and we've gotten these 28 jailers on it. It seems to me that it's very clear, and they make their argument in their 28 jailer, that there are two problems with it here. One, it's in the prosecutor's file, and two, there's a representation, and I tried to find the reference in the appendix. It's not on 249. I'll ask where it is. But apparently, assuming that the reference is right, the prosecutor specifically said that they turned over everything as to Jackson. So why in the world would they not rely upon that and go digging through the bowels of the clerk of court or wherever else they would have ferried out that report? Is Your Honor referring to the supposed misrepresentation by Ms. Fisk? Right. They said it's on 249. Unless I missed it, it's not on 249. No, that was different. It's at the appendix at 576. Okay. That is actually a very disturbing aspect of this case to me because that is not a misrepresentation. And to characterize it as an affirmative misrepresentation to the other counsel, when it's not even clear what is being said, it's not even clear that Ms. Fisk is addressing the other counsel. She seems to be addressing the court. Her statement is incomplete. That's correct. But to say it's an affirmative misrepresentation. What line are you referring to? I'm sorry. We're on JA 576. I think what they're focusing on is line 14 and 15. That's right. If Ms. Fisk had said at the very beginning of trial, say on the very first day and on the record, Your Honor, I would like to inform counsel that Mr. Jackson has no criminal policy convictions. That's what should be here. It's not here. This is all we have. We have basically comments to the judge, informal comments after the prosecution has already rested at the end of the second day of trial, before the defense is about to come in. And it's way, way late in the game at that point to say that Mr. Wilson's counsel relied on that. And on the basis of that statement, that one sentence, on the basis of that, he said, Okay, well, I don't have to look into Jackson's criminal history. He looked into the criminal history of Mr. Romney. He looked into the criminal history of Mr. Gaynor. He was going to bring his own witness, Mr. Whitfield. He found his criminal history. He even found derivative information. He found derivative information on Romney. He knew he was a drug user. I mean, counsel did a lot. Correct me if I'm wrong, but as I understand it, I think it was Perdomo. Whether or not he has, and I think the point you're making on reliance is a very good point, and I'll ask the counsel about that. I assume that he's referring to the same part of the appendix that you are, even though the site's off. But doesn't the law require the disclosure of the record that's in, whether or not it's in the prosecutor's file, but here it's in the prosecutor's file. Right. She got it from the police. Let me rephrase the question. What case are you relying upon to suggest, with best authority, that there's no obligation to disclose a criminal record that's in the files of the prosecutor? Well, Your Honor, all of the cases in my brief from just about every circuit that stand for the general proposition that public records such as this are not Brady material because they're equally accessible. If there was, and I think Perdomo really is different here because Perdomo had to do with a specific request, which you don't really have here. You have Mr. Wiseman essentially asking a leading question to Wilson's counsel at a PCRA hearing. When he was asking Wilson's counsel, what kind of request did you make to the prosecutor for discovery materials or Brady materials? And Wilson's counsel said, well, I really don't remember. It was probably my standard request, which was probably something like, please hand over all discovery materials and Brady materials, probably something as simple as that. There's an affirmative obligation even absent a request. There's an affirmative obligation to disclose Brady materials. There's Brady material, but Brady material doesn't, Brady material encompasses things that are being suppressed by the, not suppressed, being held by the government to the, it's not a, basically it's not a discovery goal. The cases that you're relying upon stand for the proposition that Brady does not extend to, there's no obligation to disclose exculpatory material that the prosecutor is charged with being aware of if defense counsel could get it on his or her own. That's right. That's what you're saying. That's correct. And you're saying the cases in your brief stand for that proposition. That's correct. All right. I think that is absolutely correct. If, unless, unless, as in Perdomo, there's a specific request. In Perdomo, the attorney specifically requested. No, I didn't think you were saying unless there's reliance upon an answer after a request. Right. But you're not saying that Paloubo stands for that proposition. I'm sorry? You're not saying Paloubo stands for that proposition. Well, Paloubo, the facts, I agree with Judge Padova, and the facts are very different in that case. And you had in that case, you know, basically. He was on the records. Right. Right. And in a sense, I mean, you can. You can assume that Mr. Paloubo knew what was in his brief. Right. Right. But one would not assume that the defense counsel would know without looking what the criminal history was. Right. And if he had been misled by Ms. Fisk at the beginning of a trial, I would agree that's a Brady violation. If he had been misled. He was not. She said this. She said this, which isn't misleading at all. It's simply incomplete and unclear. If we could find a statement like that at the beginning of the case where Ms. Fisk told Wilson's counsel. Or told the judge. Or whatever. I mean, simply in response. And if you can find something where Wilson's counsel specifically said, I want all of the criminal information, all the criminal histories of all these witnesses. He didn't do that because he found them on his own. He found them for his own witness and for the other two witnesses. For some reason, he didn't do it for Edward Jackson. We don't know what that reason is. Now we've got an ineffective assistance of counsel. Well, that's not before the court. I think that that claim, if it were before the court, wouldn't necessarily. I mean, under. You'd argue materiality again. Well, not only that, Your Honor, but under Strickland. It's simply because an attorney hasn't done something that after the fact, you look back and say, well, maybe the attorney should have done that. The law doesn't presume against the attorney. The law presumes in the attorney's favor. Well, what presumption would carry so far as to suggest that a lawyer acting in a professional manner wouldn't try to find out if any witness against his client has material that could be used to severely impeach his credibility? What would be the reason for saying, you know, in my best professional judgment, I don't see a reason to find out if I can impeach this witness. Right. Where does that get you? I mean, there is no. As far as I know, the presumption doesn't go that far. The problem is the law still presumes that he must have had a good reason. He may have not had a good reason. What reason could he have had? I mean, in considering that he may have had a good reason, isn't it permissible to consider what good reason he may have had? I know that the Pennsylvania courts have a number of times in cases said, well, we presume that this cross-examination was not made because it might have an adverse reflection on the defendant. Well, Your Honor, if you're asking me to speculate, I can speculate on that. He could have had he could have actually looked at it and said this actually won't help help my client at all because it looks like the the it's not as if Jackson's criminal record were perjury or were something like that. That was that was would directly undermine his testimony. It was impersonating a police officer, which according to he's a he's a cop wannabe. Well, I mean, an attorney, if you're looking at how an attorney might not want to put that before the jury, an attorney might say, well, I don't want the jury to say that. Here's a person who wants to cooperate with the police, wants to report crimes, wants to go and give a statement when his life is being threatened. I'm sorry. I'm sorry. In God's name, wouldn't you? I mean, if you're if you're if you are cross-examining someone who is fingering your client and you want to determine to make the jury question whether that person is testifying truthfully or not. I think it would be extremely relevant that that person had been convicted of impersonating a police officer and had a. An arguable desire to be police, part of the police to help the police. I wouldn't do that unless he was an expert when he plays his music too loud. And I'm saying there are there are reasons he could have and there are reasons he might not have. The law simply says when you don't know what the attorneys are, the law presumes in the attorney's favor. It doesn't presume against the attorney. And I think I think if if the conviction had been something stronger, like perjury, I think that that argument might be better. But the conviction was someone who wants to be a police officer. In other words, wants to report crimes, doesn't want what doesn't want crimes to go unpunished. I think I think a lawyer could look at that and say, well, that's that's not going to be helpful here. Nothing else. OK, you're right. It's time you say some time for a little. Thank you, Your Honor. And I will save my final four picks for the end. OK, all right. The end. As in after we say we'll take the case under advisement. I was going to use it for my rebuttal. OK. Good morning. May it please the court. My name is Michael Wiseman and I, along with Mr. Wyckoff, represent Mr. Wilson on this appeal. Let me first talk about Mr. Gaynor. And I think the court was focused on the impeachment value of the withheld evidence regarding the interest free loans. At page 51 of the oral argument before Judge Padova on June 5th, 2006, which is not a part of the appendix. The district attorney, Mr. Gleave, conceded that the suppressed information as to all three witnesses had impeachment value. So there's really, there's a concession to this impeachment. Now, with regard to materiality, Mr. Gleave is making a very typical error in this regard. He's looking at that piece of evidence in isolation from the other suppressed evidence where Kiles, Bagley, and all of Brady's progeny teach that you have to look at the suppressed evidence cumulatively when assessing materiality. What about the common false representation? Were you referring to the site that we just had? It wasn't 249? Yeah. Let me talk about all the, what I think are misrepresentations. Whether they were intentional or not is another question. And, of course, whether they were intentional or not is irrelevant for Brady purposes because whether they're intentional or not, Mr. Wilson was deprived of their impeachment value. And, of course, the importance, the relevance of this, then, is that you're apparently relying on this not to go further in terms of. Sure, sure. Now, at page 230 of the appendix, there's an excerpt of me examining Mr. Trigiani. And I asked him if he recalled the motions he filed in this case, and he said he didn't. But then he proceeded to tell us what his standard practice would have been. And, of course, there's no big surprise. I specifically asked him would he have filed a Brady motion. He said yes. I asked if he would have made a request for the prosecution to turn over crim and falsi. He said yes. Now, even if he hadn't have asked, as Judge Padova found, the rule of criminal procedure in Pennsylvania would have required that those materials be turned over anyway. But we do have a specific request here of Mr. Trigiani. Was that disputed anywhere? I didn't see it. No, it's not. But did they dispute that such a motion was filed? No. There's no dispute whatsoever. Now, there's more than that. Mr. Gleaves says that's all we have is the colloquy on page 576 of the appendix. But there's really much more. When you look at the pattern here, Ms. Fisk brought out the prior convictions of Mr. Gaynor on direct, and she brought out the prior convictions of Mr. Romney on direct, which is a standard practice for a skilled counsel. You want to take the wind out of the cross, you bring it out on direct if you know it's coming in. The fact that she didn't bring out Mr. Jackson's on direct certainly also lends credence to the notion that she hadn't disclosed it, whether intentional or not, she hadn't disclosed it. Now, the colloquy that's on page 576 of the appendix was a charging conference. It wasn't some informal off-the-record, you know, conversation in passing. And in that charging conference, Judge Szabo asked, what are the crim and falsi? What do I have to charge the jury on? And Ms. Fisk proceeded to talk about the crim and falsi for Romney and the crim and falsi for Gaynor, and she stopped, and she said, that's all there is. Now, I'm not saying that was the failure to disclose at that point, although that was a failure to disclose. The failure to disclose occurred pretrial when Mr. Trigiani made his standard request, and Ms. Fisk failed to turn over the material. Now, Mr. Gleeb said twice by my count that the disclosures by Ms. Fisk were not misleading, but they were incomplete. And I just want to read for you a sentence out of Bagley at page 682, 473 U.S. 682, quote, incomplete response to a specific request for impeachment material not only deprives the defense of the requested evidence, but also has the effect of representing to the defense that the evidence does not exist. Well, I think your adversary would disagree that it was a specific request. I think his point is it's a general request. Give me everything. Did he respond to that? Well, again, Mr. Trigiani specifically responded yes to the question, would you have made a request, this is a quote, would you have made a request prior to trial for the prosecution to turn over convictions of any commonwealth witness that were crim and falsy? Answer, yes. That's a specific request. So we have an incomplete response to a specific request. I don't think there's really any debate here, but that Mr. Trigiani was misled. Now, the equal access argument that the prosecution has been making is really a red herring in this case, because first Bagley and more recently Banks v. Dredge tell us that when a request is made and a prosecutor says it doesn't exist or doesn't turn it over, defense counsel is permitted to rely on that representation. And it's as simple as that. Perdomo is even a more, or I should say a less strong case there. The public defender's office had a record of the prior crime, and it was different lawyers in the public defender's office, and a request was made for prior convictions to be turned over. They weren't turned over, and this court in Perdomo held that that violated Brady, even though the public defender's office had the material somewhere within their file. Well, here, of course, you have a 10 that's right in the prosecutor's book, I guess. But how do you respond to the government's argument that because this is in the public domain, anybody can get it and there's no responsibility on their part? Well, that's just not the law. As I just said, the law says that if you make a request, the prosecutor says it doesn't exist, defense counsel is permitted to rely on it. And it's significant in Perdomo that this court said. It doesn't matter that it's in the public record? It does not matter. And this court in Perdomo said specifically that when it comes to prior convictions, the prosecution's office is far more equipped to obtain that information than the defense is. And the record in Perdomo would have been as public as the record here? I would say it's even more public. Not only was it public, it was privately held in the law office of defense counsel. So it's an even more supportive for our position. Let me just also jump back to the question Judge Chigaris asked about summary judgment. I think we learned something in this case in that sometimes we try to – I'm sorry? Don't do it. Yeah, yeah. We try to be a little too fancy. Summary judgment was simply a mechanism to tell Judge Bedelva, look, we didn't have dozens and dozens of claims in this case, we had 13. And rather than spend three or four years litigating 13 claims, we said to Judge Bedelva, look, we have a claim that we in all candor and in good faith believe is a winner. Why should we go through briefing and hearings and argument and discovery and all kinds of stuff with regard to all the other claims? And so far you've succeeded. I understand that. But my next point is then how do we view this? Do we use the standard summary judgment? Well, I was going to address that next. I think as Mr. Glee conceded, there are no disputed facts yet. The only thing that's in dispute are inferences that arise from those facts. And in that regard, it's really no different than Judge Bedelva conducting de novo review of any habeas claim, which he was required to do in this instance because the bar was inadequate. Well, he said no difference because if it's summary judgment, the inferences go the other way. The inferences go to the non-movement, don't they? No, but these are inferences that are based in the state court record. Okay. These are state court facts developed in the state court. Judge Bedelva in a habeas case had to review them, had to draw whatever inferences that were appropriate from them. And, again, I think the notion that this is summary judgment is simply clouding the regular course of habeas. If we had said we want a motion for relief and didn't call it summary judgment, motion for relief on claim one, I don't think any of this would have been even raised by the district attorney. The problem is, though, that the district judge couched it in terms of the summary judgment, finding no facts. And, I mean, he seemed to apply the standard of summary judgment. He couldn't find facts at this point because, as Mr. Glebe articulated, in opposition to having further evidentiary hearings in federal court, we are stuck with the state court record. I don't necessarily agree with that, but he certainly took the position before Judge Bedelva that you have to look at the facts that were developed in the state court record. And I guess the last point about summary judgment is they haven't complained about it to this court, so I'm not really sure it's an issue in this case at this point. What is this, Fleming, I find it very perplexing. From your view of the record, which you've, I'm sure, lived with from the state court, was there a misrepresentation, or put it this way, did the prosecutor know when Fleming gave the testimony at trial that he had this relationship, however you characterize it, with his paying loans to the witness? Did the prosecution know? I can't answer that. I can speculate about it. But, again, the law says that it really doesn't matter. Well, I understand. I just wondered what was clear. You know, and just getting back to Mr. Gaynor for a moment, I think Judge Roth hit the nail on the head when she talked about how the interest-free loans puts this witness's testimony in a very different light. I mean, this was a prison informant is really what he was. He happened to know Fleming from the community. Our view is that's because he was an informant for Officer Fleming. And Officer Fleming didn't just deny interest-free loans at the trial. He specifically said, and he specifically was questioned, did you offer or give Mr. Gaynor anything in exchange for his testimony? And he flatly said no. Now, the other thing to keep in mind is that defense counsel was trying to establish at the trial that there was a quid pro quo, that Mr. Gaynor's family's illegal speakeasy and gambling operation would be allowed to remain open, and that was the quid pro quo in exchange for the information. Again, Officer Fleming denied that. Now, would that have been a very different analysis for the jury in viewing that denial if the jury had known that, in fact, Officer Fleming was giving him interest-free loans? So I think if that one fact had come out, that certainly could have turned the jury's view of Officer Fleming's and Mr. Gaynor's veracity when it came to the actual relationship. I don't think you have to read between too many lines to see what this really was. It was a prison informant neighborhood snitch who was, you know, making a living, in effect, through the illegal gambling operations by helping out. Was there any evidence on the size of the loans that Fleming made to Gaynor? No, there wasn't. The thing that I find the murkiest in all this is the one witness, Romer, I guess, who was taken to, was it Jefferson or Pennsylvania? Hahnemann Hospital. Hahnemann, that night. What use would you have made from it? Be very concrete. Sure. Had you known that. Sure. One, what is it, from your perspective, they should have told you? Just the trip to the hospital? Yes. They should have reported to defense counsel under Brady that one of their three witnesses, and this is, of course, a three-witness case, one of their witnesses had a psychotic breakdown right after testifying. That would have alerted defense counsel that, contrary to the representations through his testimony that he was in special ed and had only gone through 10th grade, that, in fact, there was maybe a lot more about this witness that was there. But clearly that letter, that's not Brady. In fact, he was in special ed and only went through 10th grade. No, they disclosed that. That's my point. I mean, I don't want to start. Because they did disclose that. They did disclose that during his testimony. In other words, he testified, I was in special ed, I went to 10th grade. Right. So it shows that the prosecutor was at least somewhat sensitive to this being a limited witness, maybe trying to explain some of those limitations for the jury. But the fact that the man was diagnosed right after his testimony with schizophrenia and the records flowing from that would have shown that he was a chronic mentally ill person who had had schizophrenia for years and years, had been taking antipsychotic medications. Well, if you're right about that, how do you write an opinion? What's the rule that comes out of that? Where do you draw the line? You're not suggesting they have to disclose a witness's entire mental history when there's anything in the mental history which Schofield Counsel might be able to spin into a cloud of credibility. How do you draw the line? Yeah, I think this is what the district attorney is calling the derivative use of this information. And at page 34 of our brief, going on to 35, we have some quotes from Kiles and from Bagley that disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable. And Bagley talks about how the material would have been used by effective counsel. And this court in Perdomo says, quote, the inquiry requires consideration of possible effects of nondisclosure on defense counsel's preparation. Now, you know, if the witness is a little anxious after their testimony and goes home and has a stiff drink, I'm not sure that's what, you know, that would need to be disclosed. But I don't think we're dealing with a very gray area here. I think this court can say without addressing all possible contingencies that when a witness has a psychotic break the evening of their trial testimony, that is something that the prosecution is required under Brady to disclose. I don't think this court should have any trouble writing that rule. And, of course, the things that derive from that are all of the things that Judge Padova found about this witness. And we're talking about fairness here. We're not talking about legal niceties or academics. We're talking about fairness and we're talking about reliability. Judge Padova found that Jeffrey Rahming was chronically mentally ill, suffered hallucinations, had memory impairments, was mixing street drugs with psychotic, antipsychotic medications. And this was a sick, sick fellow who has hallucinations. He sees things that aren't there. This is a person who, you know, is the strongest Commonwealth witness because he claimed to have known Mr. Wilson from the neighborhood. Jackson was a suspect witness, as Your Honor points out, Judge McKee, because he had never seen the shooter before. But here we have a witness who claims to know Mr. Wilson from the neighborhood who hallucinates. I mean, certainly a jury, the reliability of this verdict has to be dependent on that information being disclosed. And I can't imagine that this court could write that such an episode as a psychotic break would not be required to be reported to the defense in a trial. I think even post-trial. We, of course, don't even have to go there. The court has not asked about Jackson very much. I assume that there's not even a hint of a debate there regarding the importance of the undisclosed information. Judge McKee, you talked about some of it with regard to disarming the septic cop. But, you know, there's even more significant things in there. I mean, Jackson was evaluated by the court psychologist, Dr. Levitt, who said he had an ingrained psychological need to aid the police. And that he was at difficulty determining truth from fiction. He was not reliable. He was not a reliable historian. And, again, we have a witness who absolutely is not someone you would want to hang a death verdict on, certainly without the full disclosure of all the impeachment. If defense counsel, Mr. Gleave, argued that the response to the judge's question about Krim and Falsi did not include any reference to Jackson, if the response had included Jackson, would defense counsel at that point have taken steps? Well, I guess at that point, assuming that that was the first defense counsel had heard of it, I think defense counsel, I spent quite a bit of time with Mr. Trigiani. I think he would have erupted. Or I think of another adjective, perhaps. But he would have been pretty upset. That's the right adjective. Yeah. And I think he might very well. Well, not adjective. Verb, yes. I'm sorry. I'm worried about this younger generation's grasp. But, anyway. Go ahead. I'm flattered that I'm one of the younger generations. We start seeing briefs with LOL and other things. Then we start to worry. Some of them may be better than the ones we get. Yeah, yeah. I'm sorry. I didn't do too good in English. But in any event, Mr. Trigiani would, I'm certain, have taken steps before Judge Sable at that point to say, whoa, wait a minute. This is the first I'm hearing of it. We have to reopen. I have to get some investigation going. I have to learn more about it. I suspect that's a reasonable inference that Your Honor could draw. Let's see. I'm not sure I have a whole lot more to talk about on the Brady aspects. I'm just checking my notes here. There's no dispute that the Jackson draft sheet was in the prosecutor's file. To reiterate again, we don't have to prove she knew it. The fact that it was there is sufficient to establish the Brady violation. Oh, one more thing about Gaynor that I did want to bring out. This, you know, the whole flavor of his testimony, I mean, you know, the district attorney and Fleming tried to make it as if, you know, he's just a guy from the neighborhood who's a good citizen and reports crimes. And, of course, we all admire citizens who step forward. But this is a jailhouse informant who allegedly heard my client's admission. And let's be clear, this is not a videotaped confession to law enforcement. This is an admission made to a jailhouse snitch. The admission is not recorded anywhere. Officer Fleming conveniently lost the notebook in which he alleged to have recorded it. So that was never produced. But in any event, the first that Officer Fleming allegedly hears about it is in the summer of 84. So we go from October of 83 when Gaynor and Mr. Wilson are supposedly together in the prison and the submission is allegedly made. Fleming then says, well, you know, Lawrence, let's go down to the station house and start some proceedings. And Lawrence says, I didn't want to get involved at that point. So there goes the theory that he's just a good citizen looking to solve crimes. But then mysteriously in March of 86, about a year and a half later, he, quote, got his act together, close quote. That's at page 490 of the appendix. And he told Fleming that he would, in fact, agree to testify. So, I mean, this is pretty suspect stuff to begin with. And I think, you know, sort of closing the loop on Mr. Gaynor for what he really was, which was a paid jailhouse snitch, I think would have put his testimony in a very different light. And, again, we have to look at it cumulatively. Three witnesses, all of them have impeachment. Obviously, Jackson and Romney are of a different quality than Mr. Gaynor's. But, nonetheless, they are all, I would submit, significant individually and certainly cumulatively are incredibly significant. Unless the Court has other questions about the Brady or the bar, I'm exhausted. You're a wimp, Mr. Wiseman. You've got nine minutes to go. Now you're getting personal. I didn't ask for an interrupted time now. That's true. Well, it's always a delight to hear lawyers who are not compelled to take all the time they're given. Well, if there's questions, I'd be happy to use every moment of it. Thank you very much, Your Honors. Mr. Glieb, at the risk of being sexist, you clearly win the real man award here today. I mean, you're ready to keep going. I had to cut you off before. Let me ask you this. This struck me when I was reading through this case. One of the things that bothered me in the test is reasonable probability that undermined the verdict, basically. Right. One of the things that I keep coming back to here, sometimes you'll see cases where you say, you know, this is not just a technical problem. I'm not at all, and I won't say which one, obviously, but not that long ago, I had a habeas case. And in conference, we all agreed that it was one of the few times where we thought, maybe they got the wrong guy. We're just not really sure this is the right guy after we heard everything. Now, this doesn't strike me that way. But it dawned on me that one of the reasons that it doesn't strike me that way is totally inappropriate consideration. And it gets me to my question. I don't know what part of the city you live in. But are you familiar with West Monterey, Chestnut Hill, Society Hill? Vaguely. I live in the northeast myself, so. But I know some parts of the area. Okay. I don't know if there is such a thing. But let's take the Byberry Business Association. If this defendant were not Zachary Wilson, but the president of the Byberry Business Association, and he were convicted of the same crime by the same testimony, can you seriously say you wouldn't really be very concerned whether or not this guy was the shooter? I mean, part of the thing that drives the certainty here is the fact Wilson's a bad guy. It doesn't mean he's guilty of this crime, but he's a bad guy. He's got an incredibly horrendous record. Your Honor, I respectfully would just... On this testimony, you don't think if the outstanding citizen in Philadelphia, the winner of the Freedom Medal, were convicted on this testimony, you wouldn't have a problem with it? In all candor, I would not. I think the testimony is actually very, very strong. I mean, you have two witnesses, one of which knew him and was able to say under the penalty of having death threats, yes, I'm absolutely sure. Who hallucinates, schizophrenic, sees things that aren't there. You've got Jackson who identifies him six and a half years later after seeing him for a split second. And you've got the jailhouse confession. Who didn't identify him immediately afterwards. Right, right. And you've got the jailhouse confession. Well, there was a reason for that. There was somebody who arguably, at least, is being protected by the guy he gave the statement to, Officer Fleming. His father is anyhow. That doesn't trouble you. Your Honor, I think the prosecution, I mean, this case was back before I was even in law school when it actually happened. You know, the prosecution, I think when you look at the job the prosecution did, I mean, they did try to bring the case at the very beginning. I think back in 81. And for whatever reason, they didn't go forward with it. They didn't go forward with it. But once they had basically the jailhouse information, they thought, now we think we have enough. But it seems to me that they ever did. I was making about, and I hadn't thought of this before, that if the DA who was a very, very skilled homicide attorney brought out on direct examination the criminal fallacy materials for two witnesses, but does not bring it out for the third witness into some issue about whether or not the defense counsel was deliberately misled. And it's in her file. This is not somebody who prepares for a trial in a sloppy manner. But doesn't that kind of, well, I guess I know the answer to that question, but it seems to me somewhat suggestive that that was a deliberate attempt not to disclose Jackson's criminal fallacy because it wasn't dealt with on direct. It's in the file. There wouldn't be any reason for her, because it was a public record. There wouldn't be any reason for her to try to suppress it. I think that indicates that she probably just didn't know it. I mean, Wilson's counsel actually made an extensive effort in trying to impeach Jackson because Jackson had, I think, misidentified somebody at a lineup and I think had even told the police, no, it's the wrong person, but then I changed my mind. I mean, I think that, as far as impeaching Jackson, that was much more to the point. I mean, that was basically, here you are in this particular case. You're lying in this case, and he even asked them to, you know, basically to follow the question. But now you're telling the truth, aren't you? I mean, that's all right in the trial. The law that breaks the camel's back. Well, Your Honor, we've never been saying, and we're looking at the evidence both cumulatively and individually, that the evidence about Jackson, if it had come out, would have had some minor impeachment value. The thing is, it wasn't suppressed. It cannot be suppressed if it's public information, unless the counsel was misled. And I would like to call the Court's attention, look at the PCRA testimony when Mr. Wiseman is cross-examining or examining Mr. Wilson's counsel. And he goes to the core point here is was this counsel misled so that he wouldn't look in the public record? There's a request for criminal falsely convictions for all witnesses. Well, those are Mr. Wiseman's words. Well, the answer is yes. The answer is yes. Counsel agreed with the leading question. But when you look at the question — Is that your best argument? I'm sorry. Is that your best argument, Mr. Trigiani, agreed with the leading question? He said yes. He said yes. I mean, his answers before that were, well, I don't really recall what I asked. Did you object to the leading question? I don't think we did. I don't recall. I wasn't there. But look at the issue of reliance. The only way they get around the fact that this is a public record and, therefore, it wasn't suppressed, is that Wilson's counsel relied on a misrepresentation by the prosecutor. Look at the PCRA testimony about how Mr. Wiseman — look at how that's developed. One question is asked. It's another leading question to which Wilson's counsel says, yes, the record speaks for itself. He doesn't say, well, on the basis of that, you didn't look at Jackson's criminal record, did you? He doesn't say that. You know, there are two types of leading questions. There's one type of leading question where you have interviewed the witness ahead of time, and you know what he's going to say, and you put it in the leading form just to get to it quickly. Right. And there's another kind of leading question where you put information in the witness's mind that the witness didn't have already. Right. And it seems to me the leading question you're talking about falls in the first category because, obviously, Mr. Wiseman would have discussed the case with Mr. Tregani ahead of time and would know what Mr. Tregani was going to say. So he's not putting words in his mouth. He's moving forward quickly. Your Honor, I urge the Court to look at that testimony carefully because I think that's a — he actually is putting words in his mouth. He has to ask the question three or four times before he gets it. You think he didn't talk to him ahead of time about it? Oh, I'm sure he did. Yeah, okay. But he literally asks the question three or four times because the first answer he gets, he's not satisfied. So we should assume, based upon the procedural posture of this case, that Tregani did not ask for criminal policy convictions for all witnesses. Your Honor, I think we should look at his testimony. His testimony says, I don't really recall I made a general request. Your Honor. For all criminal policy. He may not have gone Gaynor, Jackson, down the line, Romer. The way I read it was he made a request for criminal policy convictions for all of the witnesses without itemizing the witnesses. Well, Your Honor, he was able to find those convictions for his other witnesses, in fact, his own witnesses. That's it. Thank you very much. I'll take them back to the advisor. Thank you, Your Honor. Thank you, Your Honor.